(C.D. 3952)

JOHN C. ROGERS & CO., INC., A/C HOEGANAES SPONGE IRON CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 16, 1970)

*Sharretts, Paley, Carter & Blauvelt* (*Charles P. Deem* of counsel) for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Harold L. Grossman* and *Andrew P. Vance,* trial attorneys), for the defendant.

Before RICHARDSON and LANDIS, Judges

LANDIS, Judge: This protest raises question as to the common meaning of the tariff term "fire brick" in paragraph 201(a) of the Tariff Act of 1930. Both sides agree that determination of that question is necessary to the proper classification of articles here invoiced

as "saggers" and "rings" imported from Sweden. Plaintiff claims that the articles are "fire brick" dutiable at 5 per centum ad valorem under paragraph 201(a), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108.

Customs officials at Philadelphia, the United States port where the articles were entered, have classified the described invoice items as articles, wholly or in chief value of earthy or mineral substances, dutiable at 15 per centum ad valorem under paragraph 214, Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802.

Webster's New International Dictionary, 1945, at page 2198, defines a "sagger" as:

> 1. *Ceramics. a* A box made of fire clay, in which delicate pieces are placed while being fired either for biscuit or for glaze. *b* The clay of which saggers are made. 2. *Metal.* A box in which cast-iron articles are packed in contact with hematite ore or smithy scales, to be rendered malleable by decarbonizing in the annealing furnace. [Emphasis quoted.]

While the invoiced "saggers" in this case are not, as we look at the representative samples (exhibits 2 and 5), a box, they are, according to the testimony, used with the imported rings to build a chamber in which cast-iron is packed for reduction in a furnace.

The sample "sagger" is a large heavy looking article in the shape of a tube or cylinder, open at both ends. We have measured the sample (hereafter called a tube). It is approximately 14 inches in diameter, 18½ inches in height, and about ¾ of an inch thick. The "ring" (exhibits 3 and 4), which also has a heavy appearance, is of a slightly greater diameter than the tube.

Mr. P. Ulf Gummeson, president of Hoeganaes Sponge Iron Corporation (hereafter Hoeganaes), the plaintiff and importer of the tubes and rings in this case, testified on trial. He corroborated the fact that the imported tubes and rings are composed of silicon carbide, an earthy or mineral refractory material, which his firm found best suited their process for producing sponge iron. The tubes and rings are not, he said, standard or special shape catalogue items of the refractory manufacturer, but were specially designed, both as to composition and shape, by or for the Hoeganaes sponge iron process, as shown in schematic drawings. (Exhibits 2–A and 3–A.) The articles are molded, worked "pretty much by hand" (R. 22), and fired in kilns or furnaces. No one else, to the best of Mr. Gummeson's knowledge, imports the tubes and rings, or buys or sells them in the United States. We conclude that the articles are exclusively imported and used by Hoeganaes.

Mr. Gummeson also testified how the tubes and rings are used. The tubes and rings are often, but not always, used with a bottom plate (exhibit 6), which is leveled with mortar on the platform of a kiln flat car. A tube is put on the bottom plate; a ring is put on the tube, then another tube, another ring, and so on until four tubes and four rings are pyramided on one another, into a so-called reaction chamber. Twenty such chambers are built up on a kiln flat car. The outside rings of each chamber touch on one another to provide a "good mesh of stability to the individual chambers", as shown in schematic drawing (exhibit 7) and photograph (exhibit 8). No mortar is used between the tubes and rings since "the material itself sweats a little and it bonds itself fairly nicely; enough for * * * [Hoeganaes] purpose." (R. 33.)

Each of the chambers is next filled or charged with raw materials consisting of a hollow iron ore cylinder, about six feet tall, embedded in a mixture of coke and limestone. After the chambers are filled, they are topped with a lid. The kiln flat cars with the chambers charged and lidded, are then moved, like railroad cars, through a kiln tunnel, as depicted in exhibit 9, in illustrations marked thereon as A, B, and C. The kiln tunnel is a continuous operation; as one kiln car leaves the tunnel (the number of kiln cars in the tunnel at the same time is not a matter of record, but is apparently more than one), another enters the tunnel. It takes "in the order" (R. 28) of 35 hours to heat the chambers built on the kiln cars and effect reduction, by coke, of the iron ore into fairly strong, but hollow porous cylinders of iron, which are pulled out of the various chambers by specially designed tongs. The residue coke and limestone is then vacuumed out of the chambers. The chambers, unless there is damage requiring repair, are again recharged and put through the tunnel cycle.

One of the reasons the classification of these tubes and rings has generated so much heat is that they are comparatively new articles of commerce. According to Mr. Gummeson, tubes and rings like those before us were imported into the United States for the first time in 1953. The imported articles, of a special shape and design, are apparently unlike any standard or special shape fire brick in existence at the time the Tariff Act of 1930 was enacted, containing, as in previous tariff acts, the *eo nomine* classification "fire brick" under paragraph 201(a). As we shall discuss, *infra*, it was a commonly known fact in 1930 that "fire brick" was made in a variety of shapes and sizes.

Plaintiff submits that we need look no further than *Trans-Seas Shipping Co.* v. *United States*, 2 Cust. Ct. 784, 785, Abstract 41758 (1939), to decide this case. The articles in *Trans-Seas*, invoiced as

tiles, blocks, tweeds, posts, covers, spout bottoms, spout pieces, and various other forms, were made of fire clay. The abstracted opinion recites that:

> * * * From the evidence it was found that the various shapes of the articles in question are made from the same material as firebrick and used for the same purpose of resisting intense heat. In view of Abstracts 43299 and 43469 they were held more specifically provided for as firebrick than earthy or mineral substances. The claim under paragraph 201(a) was therefore sustained.

Abstract 43469 (37 Treas. Dec. 369 (1919)), cited in *Trans-Seas*, quite simply recites that "[i]t was found that the commodity in question is made from the same clay from which fire brick is made and that it is to be used in connection with furnaces, either in the lining of the furnace or other places of contact with heat." It held that "commodity" dutiable as fire brick on authority of Abstracts 29550 (23 Treas. Dec. 104 (1912)) and 37978 (28 Treas. Dec. 1229 (1915)), both of which cite Abstract 26306 (21 Treas. Dec. 141 (1911)), as a judicial precedent.

Abstract 43299 (37 Treas. Dec. 329 (1919)), cited in *Trans-Seas Shipping, supra,* also cited Abstract 26306 as one of several precedents for holding "[o]ctagon shaped and oblong blocks with a hole running through the center, made of the same material as the ordinary standard square firebrick and used in the same manner and for the same purpose" dutiable as "fire brick" under the 1913 Tariff Act.

Abstract 26306 (*Wing & Evans* v. *United States,* 21 Treas. Dec. 141 (1911)), to which *Trans-Seas* in effect goes back by way of cited judicial precedents, involved the term "fire brick" under the Tariff Act of 1909. The opinion there states that:

> The articles in question are used in the construction of coke ovens, and the testimony shows that they are made from natural clays, ground up, mixed together, forced into molds, and then dried and baked at a high temperature. The importers' chemist testified that they are practically the same as American fire bricks in the main constituents, though they contain less impurities, the component parts being silica and alumina. The articles in question fall squarely within the provision of paragraph 84 [fire brick] and should be so classified. * * *

The *Trans-Seas* holding, that articles made from the same material as fire brick and used for the same purpose of resisting intense heat are "fire brick", is, on its face, somewhat broader than the *Wing & Evans* holding as to *articles which resist intense heat and are used in the construction of coke ovens.* It, *Trans-Seas,* has not been cited or followed that we can find, since it came down in 1939. We do not follow *Trans-Seas* because we are of the opinion that the material of

which an article is made and its use in resisting intense heat are not the correct criteria for classifying "fire brick" within the common meaning of the tariff term "fire brick" in 1930.

The common meaning of an *eo nomine* tariff term must be determined as of the effective date of the act in which the term appears. Once the common meaning is determined, it includes new articles not known in international commerce at the time of the act, which "fairly and clearly", *R. J. Saunders & Co., Inc.* v. *United States*, 49 CCPA 87, C.A.D. 801 (1962), meet the essential criteria for the *eo nomine* classification. *Hoyt, Shepston & Sciaroni, S. Blondheim & Co.* v. *United States*, 52 CCPA 101, C.A.D. 865 (1965) ; *Davies Turner & Co.* v. *United States*, 45 CCPA 39, C.A.D. 669 (1957). Some of the principal sources for searching out the common meaning of a tariff term are dictionaries, encyclopedias, and legislative history. *United States* v. *Mercantil Distribuidora, S.A., Joseph H. Brown*, 43 CCPA 111, C.A.D. 617 (1956). We find that all sources, some of which plaintiff cites, conjoin in the common understanding that the essential criteria of a "fire brick" are that it is a heat resistant article used in the construction of linings for furnaces, ovens, and similar installations.

Dictionaries and other authorities define and discuss the term "fire brick" as follows:

New Century Dictionary and Cyclopedia, 1913 edition (plaintiff's brief, page 22) :

> A brick made of material which will not fuse readily in a kiln or furnace; *used for lining furnaces, etc.* [Emphasis added.]

Glossary of Mining and Mineral Industry, U.S. Department of Interior, Bureau of Mines, Bulletin 95, 1920 (plaintiff's brief, page 22) :

> A refractory brick of fire clay or of siliceous material *used to line furnaces.* [Emphasis added.]

Webster's New International Dictionary, 1927 edition (plaintiff's brief, page 21) :

> A refractory brick, capable of sustaining high heat without fusion, usually of fire clay or other highly siliceous material, and *used for lining fire boxes, etc.* [Emphasis added.]

Materials Handbook, George S. Brady, second edition, 1931 (plaintiff's brief, page 22) :

> A term employed to distinguish bricks *used in fire places, furnace linings, or flues* where ordinary bricks are likely to melt or crack. * * * Firebricks are made in *various shapes and sizes*, and are usually white or buff in colors. * * * [Emphasis added.]

Encyclopaedia Britannica (1947) :

> Under this term [fire brick] are included *all* bricks, blocks, and slabs *used for lining furnaces, fire-mouths, flues, etc.* [Volume 9, page 266. Emphasis added.]

Columbia Encyclopedia (1950) :

> a brick characterized by its high degree of *resistance* to heat, used in the *construction of kilns, furnaces* * * * made in a *variety of shapes and sizes* * * *. [Emphasis added.]

The Encyclopedia Americana (1953) :

> a brick capable of sustaining, without fusion, the extreme action of fire. They are *used* for *lining furnaces and for all kinds of brick-work exposed to intense heat which would melt common bricks.* [Volume 11, page 234. Emphasis added.]

That Congress understood the term "fire brick" to mean the same as above defined is a matter of legislative history as follows:

Summary of Tariff Information (1920), page 135 (plaintiff's brief, page 28) :

> Description and Uses. * * * *Fire brick* (refractory brick), composed of substances having a high melting point, are *used in structures which must endure exposure to high temperatures, including glass-making and metallurgical furnaces, coke ovens, and settings for boilers.* For many special purposes brick composed of silica, magnesite, chromite, bauxite, dolomite, or carborundum are needed in order to withstand the chemical action of molten metals or slags. * * * [Emphasis added.]

Summary of Tariff Information (1929) :

> Descriptions and Uses.—Fire bricks are those manufactured from highly refractory clays or minerals. They are made in a variety of shapes and * * * are *used largely as refractory linings* in the construction of metallurgical and other furnaces. [Page 421.]

Digest of Trade Data prepared by the Tariff Commission in connection with the first Canadian Trade Agreement, T.D. 48033 (plaintiff's brief, page 30) :

> * * * They are [fire brick] *made in many shapes and sizes,* but the standard straight brick is the most common form. * * *
>
> Fire brick are *used almost wholly in the construction of linings for the interior of metallurgical furnaces, coke ovens, boilers, annealing ovens, and kilns and furnaces* used in the ceramic industry, including the glass and cement industries. [Emphasis added in part.]

Summaries of Tariff Information (1948) volume 2, page 7 :

> Firebrick are refractory or heat-resisting products which are indispensable in the *construction of metallurgical furnaces, boilers,*

*kilns, and other equipment* subjected to high temperatures. [Emphasis added.]

The judicial principle that it is not how an article is called but how it is used that determines whether it is brick, *Waddell & Co.* v. *United States*, 5 Ct. Cust. Appls. 63, T.D. 34098 (1914), *Wm. H. Grueby* v. *United States*, 47 Treas. Dec. 249, T.D. 40723 (1925), is equally valid as to "fire brick" as it is to general construction brick.

We note that, whenever size and shape are mentioned, it is the consensus of the reference authorities, *supra*, that "fire brick" comes in a variety of sizes and shapes. We have, therefore, eliminated size and shape as essential criteria for "fire brick". For the same reason we rule out limiting the term "fire brick" to the generally accepted connotation of rectangular shaped brick, or shapes with one "classically rectangular side" which is what defendant argues for. (Defendant's brief, pages 16, 17, 18.) Nor can we, with any degree of certainty, go along with plaintiff's contention that all "refractory shapes used for the purpose of resisting intense heat, are fire brick." (Plaintiff's brief, page 21.) We agree with defendant that what has caused this record to abound in confusion is the use of the term "refractory", along with the terms refractory shapes, refractory brick, and fire brick shapes, all of which crop up at one place or another in the testimony of the expert witnesses, lexicons, and other authorities. A "refractory" is an object that is capable of "resisting ordinary treatment; difficult to fuse, reduce, draw out, or the like". (Webster's New International Dictionary, 1927 edition, cited by defendant.) Refractories are "suitable for saggers, crucibles, [and] construction or lining of furnaces, etc." where high temperatures must be withstood. (Webster's New International Dictionary, 1945 edition.) The lexicons and expert witnesses in this case all agree that while the term "refractory" includes all "fire brick", not all refractories are "fire brick". Thus, refractories include supports and containers, called kiln furniture, and, if you will, saggers, which we understand are shapes made of heat resistant material, used for the purpose of resisting intense heat.

Under plaintiff's proposed criteria for "fire brick", namely, any refractory shape "used for the purpose of resisting intense heat", the term "fire brick" would have to include saggers and kiln furniture. Except for the opinions of plaintiff's expert witnesses, which are no more than advisory to the court, *United States* v. *Mercantil Distribuidora, S. A., Joseph H. Brown*, *supra*, we have not found a single lexicon or similar authority which even suggests that saggers and kiln furniture are included in the common meaning of the term "fire brick". See, Norton on Refractories, 3rd edition, 1949, pages 523 through 528, discussing "Sizes and Tolerances" of various refractories

including standard shape refractory brick, i.e. "fire brick", used in all types of construction; special shapes of fire brick used for particular types of construction; kiln furniture "i.e., supports and containers for ceramic ware while it is being fired", and saggers which are "refractory boxes for holding whiteware".

It remains only to decide whether these imported tubes and rings "fairly and clearly" meet the essential criteria for "fire brick" which, as we have found, in 1930 included only articles made of heat resistant material, used in the construction of furnaces, ovens, and the like. We conclude that they do not.

These imported tubes and rings, in the condition as imported, meet rather exacting specifications. (Exhibits 2–A, 3–A, and 7.) All that needs be done is to assemble the tubes and rings into a chamber which may, or may not be, akin to a furnace, oven, or exotic sagger. Assembling the tubes and rings into a chamber is not "fairly and clearly" like constructing a furnace or oven. Fire brick used in the construction of a furnace or oven also connotes a masonry unit of a sort. These tubes and rings are not used as masonry units. They are prefabricated units designed to fit together in an orderly manner and more than mere fire brick which, along with some special, but still standard shapes, are used as linings for furnaces and ovens. E.g., *United States* v. *The A.W. Fenton Company, Inc.*, 49 CCPA 45, C.A.D. 794 (1962). There is no need to further expound on the distinctions. They are carefully lexiconed. Nowhere have we found that the word "assemble" is synonymous with the word "construction" or "construct". We are satisfied that these distinctions are valid, and that they are fatal to the classification of these imported tubes and rings as "fire brick". Cf. *R. J. Saunders & Co., Inc.* v. *United States, supra* (holding that electric dry shavers were not included within the common meaning of the term "safety razor").

We have not referred to plaintiff's exhibit 1 (Bureau of Customs letter) and exhibit 10 (list of liquidated entries not involved in this case) because they are immaterial and irrelevant to the issue. Having eliminated size and shape as essential criteria for "fire brick", exhibits 11, 12, 13, and 14 (illustrating standard and special shapes of fire brick sold in the trade and commerce of the United States) are also not probative, either way, of what we have held.

The protest is overruled. Judgment will enter accordingly.