(C.D. 4553)

PITTSBURGH PLATE GLASS COMPANY *v.* UNITED STATES

Court Nos. 66/53432–B and 66/72134

(Decided July 18, 1974)

*Barnes, Richardson & Colburn* (*Rufus E. Jarman, Jr.* of counsel) for the plaintiff.
*Carla A. Hills*, Assistant Attorney General (*John A. Gussow*, trial attorney), for the defendant.

NEWMAN, Judge: The issue in these two consolidated protests concerns the proper rate of duty on merchandise invoiced as "tank blocks",[1] produced in West Germany and imported by plaintiff at

the port of New York in 1965. The "tank blocks" were classified by the Government under the provision in item 531.39 of the Tariff Schedules of the United States (TSUS) for "Other" shaped refractory and heat-insulating articles not specially provided for, and assessed with duty at the rate of 15 per centum ad valorem. Plaintiff claims that the articles are properly dutiable under the provision in item 531.27, TSUS for refractory and heat-insulating *bricks* at the rate of 3 per centum ad valorem.

## STATUTE INVOLVED

Schedule 5, part 2, subpart A, TSUS:

Refractory and heat-insulating bricks of all sizes and shapes:

\*    \*    \*    \*    \*    \*    \*

---

[1] It may be noted that the merchandise was described by the customs examiner as "bricks" on the "Notice of Action Increase in Duties" (customs form 5555).

531.27    Other bricks_____    3% ad val.
    Shaped refractory and heat-insulating
    articles not specially provided for * * *:
        *    *    *    *    *    *    *
531.39    Other _____    15% ad val.

### The Issue

Since it is undisputed that the imports are refractory, the sole issue presented for determination is whether the imports are refractory "bricks" within the common meaning of that term.

I have concluded that the protests should be sustained.

### The Record

The record comprises the testimony of four witnesses on behalf of plaintiff and one witness on behalf of defendant. Additionally, plaintiff submitted eight exhibits, including a stipulation of fact and the official papers; and defendant submitted six exhibits.

The stipulation reads as follows:

> The articles in question were manufactured at the Niederlahnstein Works of Didier Werke A.G. They were pneumatically rammed of clays and fired to a temperature of 1,100°C in an intermittent kiln fueled by gas produced from lignite coal. The fired block were surface dressed with silicon carbide wheels and the bolt holes were drilled.

Approximate chemical analysis and selected physical properties of the imported articles are as follows:

### Chemical Analysis

| | |
|---|---|
| $SiO_2$ | 70.7% |
| $Al_2O_3$ | 22.8% |
| $Fe_2O_3$ | 0.59% |
| $TiO_2$ | 1.9% |
| CaO | 0.2% |
| MgO | 0.3% |
| $K_2O$ | 2.7% |
| $Na_2O$ | 0.5% |
| $V_2O_5$ | 0.01% |

### Physical Properties

| | |
|---|---|
| Refractoriness (Seger Cone) | 30½  (1,689°C) |
| % Apparent Porosity | 20.2 |
| Bulk Density | 124#/ft.³ |
| Thermal Conductivity | 5.0 at 200°C |
| | 7.7 at 800°C |

The imported articles were used to line the lower portion of the float chamber in the float glass production process.

The float glass production process involves the mixing of batch ingredients, introduction to a melting furnace, and discharge of the finished molten glass to a float bath chamber. Within this chamber the glass spreads onto the surface of molten tin and is continuously drawn through a diminishing temperature environment in such a way that the glass hardens to its final form and is conveyed out of the float chamber into an annealing oven and thence to final processing and packing. The articles in question function to contain the molten tin, provide thermal insulation, and minimize contact between the tin and the outer casing.

The imported articles in question are provided with counterbored holes to permit them to be fixed in place by bolts welded to the steel casing. This also prevents their flotation by the hydrostatic head of molten tin. The counterbore is filled with a ceramic mortar after the bolts are secured. This procedure prevents contact between the bolt heads and the molten tin. Each block is set with a precalculated expansion gap between adjacent block elements so that when heated the exposed surface of the refractory is as monolithic as possible.

The testimony of record further establishes:

The imported articles, referred to in the trade as "tank blocks" or "flux blocks," were imported for use in constructing a refractory lining in the tin bath of the float-glass furnace at plaintiff's glass-making facility at Crystal City, Missouri. The blocks were of various shapes and sizes, the majority of blocks being rectangular and measuring approximately 1 by 2 by 3 feet, and weighing between 800 and 900 pounds.

After the tank blocks arrived at plaintiff's plant at Crystal City, they were placed individually across the bottom of a steel containing pan, in accordance with detailed drawings of the refractory lining, and bolted in place. The relatively large sizes of the tank blocks are dictated by this practice of bolting the individual blocks to a substructure, and by the fact that the large units minimize the number of joints which are more susceptible to the corrosive action of the molten materials than are the blocks.

### CONTENTIONS OF THE PARTIES

While admitting that the tank blocks are larger than ordinary construction or refractory bricks, plaintiff contends that use, not size, is the determinant criterion of what constitutes a refractory brick for tariff purposes. Thus, plaintiff argues that the use of the tank blocks in constructing a refractory lining for the tin bath of a float-glass furnace constitutes the blocks as "refractory bricks" within the common meaning of the term.

Defendant, on the other hand, does not dispute that the merchandise is refractory, but insists that the tank blocks are not "bricks" within the common meaning of the term.

## COMMON MEANING OF "REFRACTORY BRICK"

It is, of course, fundamental in determining the common meaning of a term or word used in a tariff provision that court decisions, dictionary definitions and other lexicographical authorities may be considered. Thus, in *John C. Rogers &Co., Inc., a/c Hoeganaes Sponge Iron Corp.* v. *United States*, 64 Cust. Ct. 12, C.D. 3952 (1970), *aff'd* 58 CCPA 104, C.A.D. 1012, 436 F.2d 1034 (1971), the issue presented was whether certain tubes and rings fell within the common meaning of the term "fire brick" in paragraph 201(a) of the Tariff Act of 1930.[2] After reviewing various dictionaries, encyclopedias, and administrative publications, Judge Landis (writing for the Third Division) stated the criteria for classifying "fire brick" as follows (64 Cust. Ct. at page 16):

> * * * We find that all sources [for searching out the meaning of a tariff term], some of which plaintiff cites, conjoin in the common understanding that *the essential criteria of a "fire brick" are that it is a heat resistant article used in the construction of linings for furnaces, ovens, and similar installations.* [Emphasis added]

In *Rogers*, the trial court held that the tubes and rings were not "fire brick", and observed (64 Cust. Ct. at page 19):

> It remains only to decide whether these imported tubes and rings "fairly and clearly" meet the essential criteria for "fire brick" which, as we have found, in 1930 included only articles made of heat resistant material, used in the construction of furnaces, ovens, and the like. We conclude that they do not.
>
> These imported tubes and rings, in the condition as imported, meet rather exacting specifications. * * * All that needs be done is to assemble the tubes and rings into a chamber which may, or may not be, akin to a furnace, oven, or exotic sagger. Assembling the tubes and rings into a chamber is not "fairly and clearly" like constructing a furnace or oven. Fire brick used in the construction of a furnace or oven also connotes a masonry unit of a sort. These tubes and rings are not used as masonry units. They are prefabricated units designed to fit together in an orderly manner and more than mere fire brick which, along with some special, but still standard shapes, are used as linings for furnaces and ovens. E.g., *United States* v. *The A. W. Fenton Company, Inc.*, 49 CCPA 45, C.A.D. 794 (1962). There is no need to further expound on the distinctions. They are carefully lexiconed. Nowhere have we found that the word "assemble" is synonymous with the word "construction" or "construct". We are satisfied that these distinctions are valid, and that they are fatal to the classification of these imported tubes and rings as "fire brick". * * *

---

[2] It is undisputed that the terms "fire brick" and "refractory bricks" are synonymous. *Encyclopaedia Britannica* (1970), vol. 9, page 294. See also *Summary of Tariff Information,* 1920, page 135.

By contrast to the tubes and rings in *Rogers*, the tank blocks in the present case are not prefabricated components designed for mere assembly into a chamber, but rather are large masonry units used to construct the refractory lining for the tin bath of a float-glass furnace. In this respect, the tank blocks differ substantially from the merchandise in *Rogers*.

According to defendant's expert witness, who was an officer of a large United States manufacturer of refractory articles, "tank blocks" are referred to in the trade also as "flux blocks", the terms being synonymous (R.182). Significantly, *Encyclopaedia Britannica* (1970), vol. 9, indicates that "flux blocks" used by the glass industry [3] are refractory bricks. Thus, at pages 294–295 it is stated:

> FIREBRICK. Another descriptive term for this product is refractory brick, which includes a variety of shapes made from nonmetalic minerals and intended for service at high temperatures. The largest consumers of firebrick are the metal and glass industries.
>
> \* \* \* \* \* \* \*
>
> Firebrick is vital to the production of glass. Glass furnaces or tanks, as they are called, are elaborate refractory structures in which high rates of melting can be maintained. Glass may be considered as a special and extremely corrosive type of slag. Several materials used in its manufacture, such as soda ash, sodium sulfate, lime and borax, react vigorously with many refractories at high temperatures. For this reason highly siliceous, dense, *fireclay bricks, known as flux blocks*, are much used in the portion of the tank that is in contact with molten glass. \* \* \* [Emphasis added.]

Flux blocks, whether used in the tin bath or in the melting furnace, serve the same general function, viz: provide a heat-resistant lining. In this connection, plaintiff's chief power engineer, who had the responsibility for the design and construction of glass melting furnaces and the selection of refractory bricks and other refractory materials for use in plaintiff's glass plants, testified (R. 32–33):

> Q. Would you describe exactly what the function of these imported articles installed in the flow bath is?—A. Their function primarily is to provide a thermal barrier between the molten tin contained within the flow bath and the metal casing. In addition, they also provide a resistance against corrosion and some structural capability.
>
> Q. How would you describe the function of similar articles used in the melting furnace portion?—A. Similar articles in the melting furnace portion would serve, in general, the same purpose except that they would not be resisting the action of molten tin but rather the action of molten glass.
>
> Q. Do they have a heat saving or insulating function?—A. Yes.

---

[3] Interestingly, in Walsh Refractories Corporation's sales catalog (defendant's exhibit F), page 134, flux blocks for the glass industry are depicted. On page 132 of the catalog, flux blocks listed as "CAST FLUX No. 71" perform the same function as the imports (R. 169–170).

Q. In both uses ?—A. Yes.

Moreover, in *Rogers*, the trial court noted that fire brick is "used in the construction of linings for furnaces, ovens, *and similar installations.*" (Emphasis added.) Plainly, the tin bath of the float-glass furnace is a "similar installation" within the meaning of the above-quoted statement. Furthermore, *Encyclopedia Americana* (1953), vol. 11, page 234, points out: "* * * They [fire brick] are used for lining furnaces, *and for all kinds of brick-work exposed to intense heat which would melt common bricks.*" (Emphasis added.)

Consequently, I find that whether flux blocks are used in a glass-melting furnace to act as a thermal barrier to molten glass or, as in this case, are used in the tin bath to act as a thermal barrier to resist the action of molten tin, such blocks fall within the common meaning of "refractory brick". In reaching the foregoing conclusion, I have considered defendant's evidence that flux blocks differ from standard straight refractory bricks (as defendant's exhibit B) in such factors as: size, costs, manner of pricing, method of manufacturing, time required to manufacture, finishing procedures after firing, quality control and method of installation. However, I do not deem those factors to be controlling in light of the common meaning of "fire brick" (refractory brick) as enunciated in *Rogers*, which focuses upon the *use* of the heat-resistant article.

Further, defendant's efforts to limit item 531.27, TSUS to "standard" refractory brick such as exhibit B must fail, since item 531.27 is an *eo nomine* designation without limitation, and therefore includes all forms of refractory brick, absent any showing of contrary legislative intent, judicial decision, or administrative practice. Cf. *Nomura (America) Corp.* v. *United States*, 58 CCPA 82, 85, C.A.D. 1007, 435 F. 2d 1319 (1971). The Walsh Refractories Corporation's sales catalog (exhibit F) demonstrates that there are many possible variations in the size and shape of refractory brick. For example, included are such "fire brick shapes" as: standard shiplap tile" from size 2 by 12 by 12 inches to 4 by 12 by 24 inches (page 48) ; "standard burner blocks" from size 9 by 7½ by 9 inches to 15 by 15 by 9 inches (page 50) ; and "kiln car tile", concerning which the catalog states: "Custom designs manufactured to meet your particular requirements" (page 55). Obviously, then, "refractory bricks" are not limited to those represented by defendant's exhibit B.

Defendant's contention that refractory bricks are a "handy-size unit" (capable of being held in the hand), predicated upon the testimony of its expert witness (R. 171), is without merit. In *Rogers*, the trial court specifically ruled out size and shape as essential criteria for "fire brick", stating (64 Cust. Ct. at page 18) :

> We note that, whenever size and shape are mentioned, it is the consensus of the reference authorities, *supra*, that "fire brick"

comes in a variety of sizes and shapes. We have, therefore, eliminated size and shape as essential criteria for "fire brick". * * *

Furthermore, the larger shiplap tile and burned blocks listed in the Walsh sales catalog under "fire brick shapes" (pages 48 and 50) could hardly be regarded as "handy-size".

Defendant also makes much of the fact (which is undisputed) that the imports were generally bought, sold and known in the trade as "blocks" (viz., tank blocks or flux blocks), rather than as "bricks". However, this fact does not preclude the classification of the imports as refractory bricks. Indeed, the trial court in *Rogers* (64 Cust. Ct. at page 18) pointed up:

> The judicial principal that it is not how an article is called but how it is used that determines whether it is brick, [cases cited] is equally valid as to "fire brick" as it is to general construction brick.

It may be emphasized, also, that there are "fire brick shapes" depicted in the Walsh sales catalog called "blocks" and "tile" (pages 48, 50, and 55).

### Conclusion

In summary, the stipulated facts and the weight of the testimony of record establish that the merchandise in this case falls within the common meaning of "refractory bricks". Accordingly, I hold that the imported merchandise is properly dutiable at the rate of 3 per centum ad valorem under the provision in item 531.27, TSUS for "Refractory and heat-insulating bricks in all sizes and shapes: * * * Other bricks", as claimed by plaintiff.[4]

Judgment will be entered accordingly.

(C.D. 4554)

---

[4] There is no dispute between the parties that the merchandise is neither chrome bricks, dutiable under item 531.21, nor magnesite bricks, dutiable under item 531.24.