EASTALCO ALUMINUM CO., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 83–1–00095

(Decided September 23, 1986)

*John M. Peterson* and *Donohue and Donohue (Joseph F. Donohue* and *John M. Peterson* at the trial; *John M. Peterson* on reply brief), for plaintiff.

*Richard K. Willard,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, *Kenneth N. Wolf,* Civil Division, United States Department of Justice, for defendant.

OPINION AND ORDER

RESTANI, *Judge:* The issue in this case is the proper classification for tariff purposes of certain carbon block, exported from France and entered at the port of Baltimore, Maryland, in 1981. The United States Customs Service (Customs) classified the merchandise as "[e]lectrodes in part of carbon or graphite, for electric furnace or electrolytic purposes" under item 517.61 of the Tariff Schedules of the United States (TSUS). Plaintiff, Eastalco Aluminum Company, claims the merchandise should be classified as refractory brick under item 531.27, TSUS. The government counterclaimed for classification under item 517.91, TSUS, "[a]rticles not specifically provided for, of carbon or graphite," and made an alternate claim for classification under item 535.14, TSUS, as "ceramic electrical ware * * * Other."

The merchandise in question is carbon block, used to construct the side and bottom lining of Hall-Heroult aluminum reduction cells at plaintiff's plant.[1] Testimony at trial indicated that the block is designed to withstand extreme stress, heat, and corrosion during the production of aluminum. Witnesses also established that for a period of twelve to twenty-four hours during the start-up phase of the cell, the carbon bottom block acts as a cathode.[2] Cathodic action is necessary for proper start-up and to ensure the longevity of the cell. After the start-up phase and after molten aluminum is added, a molten aluminum pad becomes the cathode. For the duration of the life of the cell, approximately 1500 days, the carbon bottom block continues to function in its refractory capacity.[3]

## I. The Merchandise May Not Be Classified As Electrodes

The parties agree that the carbon block at issue has refractory characteristics. Item 531.27, plaintiff's claimed classification, is an

---

[1] The Hall-Heroult process produces aluminum metal by electrolysis of the fused salt aluminum oxide [$Al_2O_3$], also called alumina, in cells containing a molten electrolyte bath whose primary component is cryolite. Electric current passes through the cell, causing the aluminum ions to separate from the oxygen ions. The oxygen ions migrate to the anode (positive electrode) at the top of the cell and the aluminum ions migrate to the cathode (negative electrode) at the bottom of the cell. When the aluminum ions reach the cathode, they pick up additional electrons and are deposited as elemental aluminum metal.

[2] There is an earlier preheating stage, but it involves no electrolytic bath. Consequently, the carbon block does not act as an electrode during that phase.

[3] Testimony also established that the carbon corner and side block (hereinafter side block) does not function cathodically except in an incidental manner or under abnormal conditions. Unlike the bottom block, it is not in the normal electrical path, and it only interacts with the electrolytic bath until a ledge of frozen cryolite is formed. The ledge remains in place during normal operation.

*eo nomine* provision for refractory brick.[4] Defendant contends, however, that the block's temporary cathodic use during the start-up phase makes classification under item 517.61, apparently a use provision, the more specific classification.[5] The general rule of construction provides that, in the absence of legislative intent to the contrary, "a product described by both a use provision and an *eo nomine* provision is generally more specifically provided for under the use provision." *United States* v. *Siemens America, Inc.*, 68 CCPA 62, 70, 653 F.2d 471, 478 (1981) (emphasis omitted), *cert. denied*, 454 U.S. 1150 (1982);[6] *Novelty Import Co.* v. *United States*, 55 Cust. Ct. 169, 173–74, C.D. 2570 (1965), *appeal dismissed*, 53 CCPA 155 (1966).

A tariff classification controlled by use is to be determined by the chief use. Rule 10(e)(i) of the General Headnotes and Rules of Interpretation states chief use is "the use which exceeds all others (if any) combined." Case law has interpreted chief use to mean the primary or principal use, not a fugitive use or mere capability of use. *United States* v. *Baltimore & Ohio Railroad Co.*, 47 CCPA 1, 5–7, C.A.D. 719 (1959) (after-dinner size china cups and saucers classified as "ornamental or decorated china" rather than "tableware," based on their chief use for display or decoration).

Inasmuch as defendant classified the block under item 517.61, "electrodes," it follows that in order for defendant's classification to prevail the block's chief use must be as an electrode. The trial record does not support this claim. Given the average cell-life of 1500 days, the carbon bottom block acts as an electrode for only twelve to twenty-four hours, or less than one percent of the cell's life.[7] Chief use is that use which exceeds all others; here that use is as a refractory brick. Therefore, the carbon block cannot be classified under item 517.61 because it fails to meet the test of chief use an a electrode.

Assuming, *arguendo*, that item 517.61 is an *eo nomine* provision, the carbon block remains incorrectly classified. When an item has features or functions other than as described by the statutory provision, either more limited or more diversified, and the difference is significant, it cannot be classified within such a provision. The item is thus said to be "more than" the type described in the statute. *Robert Bosch Corp.* v. *United States*, 63 Cust. Ct. 96, 103–04, C.D. 3881 (1969) (starter solenoid switches for starting automobile engines found to be "more than" electrical switches because they operated mechanically as well as electrically and both functions were significant in starting the motor) (cited in *Sanyo Electric Inc.* v. *United*

---

[4] "An *eo nomine* provision is one which names a specific product or describes a commodity by a specific name." *Travenol Laboratories, Inc.* v. *United States*, 83 Cust. Ct. 1, 4, 476 F. Supp. 1075, 1077 (1979), aff'd, 67 CCPA 71, 622 F.2d 1027 (1980).

[5] Apparently, defendant also claims that the carbon block cannot be classified under part 2, schedule 5, as plaintiff claims, because it is not "ceramic."

[6] In accordance with this aid to construction, the *Siemens* court held that the imported surge voltage protectors were "more specifically provided for under the use provision of item 685.90 as 'other electrical apparatus * * * for the protection of electrical circuits' than under the *eo nomine* provision of item 687.60 as 'electronic tubes.'" *Siemens*, 68 CCPA at 70, 653 F.2d at 477. The court also noted, however, that this statutory construction aid need not be automatically applied. Rather, "[t]he aid is merely 'a convenient rule of thumb for resolving issues where the competing provisions are otherwise in balance.' *Simon Saw & Steel Co.*, 51 CCPA 33, 40, C.A.D. 834 (1964) (emphasis in original)." *Id.* at 70 n.6, 653 F.2d at 478 n.6.

[7] Use of side block as an electrode is even more problematic. *See supra* note 3.

*States,* 84 Cust. Ct. 167, 175, 496 F. Supp. 1311, 1317 (1980), *aff'd,* 68 CCPA 14, 15, 642 F.2d 435, 436 (1981) (power failure light described as a multifunction article could not be classified under a statutory provision that described only one of its functions)). The carbon block at issue has features which enable it to function as more than an electrode; it is one of a few substances that can withstand the tremendous temperatures, stress, and abrasion generated by producing aluminum. This is a significant difference from an ordinary electrode, which is only a facilitator of the electrolytic process. Because the carbon block is "more than" an electrode, it cannot be classified under item 517.61.

Although the legislative history of certain statutory provisions suspending duties on electrodes is not entirely clear, it does not contradict this construction of the statutes. In referring to "electrodes" Congress described items which are made of carbon, manufactured at the site where they are to be used and which are consumed in large quantities. S. Rep. No. 530, 89th Cong., 1st Sess. 23, *reprinted in* 1965 *U.S. Code Cong. & Ad. News* 3416, 3437; S. Rep. 1235, 90th Cong., 1st Sess. 1, reproduced at 1968 *U.S. Code Cong. & Ad. News* 3999–4000; S. Rep. 91–1471, 91st Cong., 2nd Sess. 1, *reprinted in* 1970 *U.S. Code Cong. & Ad. News* 5799–5800. The record (including testimony) generally establishes that this description of "electrodes" is actually a description of "anodes." A memorandum written by Customs in 1968 uses a very similar description of anodes.[8] A reference in S. Rep. 91–220 91st Cong., 1st Sess. *reprinted in* 1969 *U.S. Code Cong. & Ad. News* 1029–30, to electrodes as "anodes and cathodes" must be considered an oversight, inasmuch as it renders the report internally inconsistent and also conflicts with three more detailed reports. Accordingly, Customs' classification is found to be incorrect.

## II. The Proper Classification of the Merchandise Has Not Been Established

Plaintiff claims the carbon block should have been classified as "other" refractory brick, under item 531.27, TSUS, "is an *eo nomine* provision without limitation, and therefore includes all forms of refractory brick, absent any showing of contrary legislative intent, judicial decision, or administrative practice." *Pittsburgh Plate Glass Co.* v. *United States,* 73 Cust. Ct. 49, 55, C.D. 4553 (1974) (tank blocks which are larger and heavier than standard straight refractory brick constitute refractory brick for tariff purposes); *cf. Nomura (America) Corp.* v. *United States,* 58 CCPA 82, 85, 435 F.2d 1319, 1321–22 (1971) ("wader boots—chest high" properly classified under *eo nomine* provision for boots, shoes or other footwear).

---

[8] Defendant's motion to strike references to certain memoranda and letters is denied. They need not be admitted into evidence insofar as they are used only to establish legislative facts. The court notes their authenticity is not denied. In any case, the court finds plaintiff's arguments regarding Congressional ratification of administrative practice less than persuasive in this case given the changing views at Customs and the lack of any reference in the legislative history to Customs' classification practices with regard to the type of merchandise at issue.

Schedule 5, Part 2, Subpart A, Headnote 3 sets out the specific properties necessary for qualification as refractory articles for TSUS purposes:

> 3. For purposes of this subpart, *"a refractory article,"* whether shaped or not shaped, is one having a bulk density over 75 pounds per cubic foot and designed to be used to resist temperatures above 260°F. A shaped refractory article has special properties of strength and resistance to thermal shock and may also have, depending upon the particular uses for which designed, other special properties such as resistance to abrasion and corrosion.

Plaintiff's witness testified during trial that the imported carbon block met each of these specifications.[9] Further, plaintiff argues that the block's ability to conduct electricity is another "special property" related to its use in the Hall-Heroult cell but that this property does not make it more than refractory brick. Defendant contends the block's cathodic applications make the block more than the refractory articles contemplated by headnote 3.

The primary function of an imported article may be determinative in establishing proper classification. *Trans-Atlantic Co.* v. *United States,* 60 CCPA 100, 103, 471 F.2d 1397, 1399 (1973); *see E. Green & Son (New York)* v. *United States,* 59 CCPA 31, 35, 450 F.2d 1396, 1399 (1971). A combination or multifunction article, however, cannot be classified under a provision that describes only one of the article's multiple functions because it is "more than" the article described by the provision. *Sanyo Electric,* 84 Cust. Ct. at 174, 496 F. Supp. at 1316–17. An incidental, subordinate, or secondary function which relates to an article's predominant use, does not make that article more than the article named in the tariff provision. *Trans-Atlantic,* 60 CCPA at 103, 471 F.2d at 1398–99; *ASEA, Inc.* v. *United States,* 7 CIT 128, 131, 587 F. Supp. 1072, 1073–74, *aff'd,* 748 F.2d 676 (1984); *Tridon, Inc.* v. *United States,* 5 CIT 167, 169 (1983); *Ashflash Corp.* v. *United States,* 76 Cust. Ct. 112, 115–16, 412 F. Supp. 585, 587 (1976). Whether or not a given function is secondary or coequal is a question of fact. *Tridon,* 5 CIT at 169 (1983).

The record at trial establishes that the carbon block provides a refractory lining for the Hall-Heroult cell. Without a complete lining, the cell is disrupted and aluminum production ceases. Both parties agree that the bottom block serves as a cathode only during the twelve to twenty-four hour start-up phase of the cell. Although the block does operate as a temporary cathode, which helps prepare the cell for its life-cycle of 1500 days, this does not make the block more than refractory brick. In this case the only significant cathodic function of the carbon bottom block is during start-up where the carbon block itself becomes sealed against aluminum penetration. Inasmuch as this enables the block to function more efficiently in its re-

---

[9] Defendant does not dispute the block's refractory characteristics.

fractory capacity, its cathodic function must be considered auxiliary.[10] *Compare with Tridon,* 5 CIT at 169–70 (clicking sound created by signal flasher as it opened and closed electrical contacts did not make it more than a switch because this function was secondary or auxiliary to the main switching function) *and ASEA,* 7 CIT at 132, 587 F. Supp. at 1074 (shunt reactors are not "more than" inductors simply because they contain bushing current transformers, where this second function (as a transformer) is auxiliary to the reactors' function as inductors).

Nonetheless, the merchandise at issue has not been shown to be classifiable as refractory brick. One issue yet to be decided is whether the electrical conductivity and resistivity of the bottom block which apparently is important throughout the life of the cell makes certain of the merchandise at issue more than refractory brick. The evidence at trial did not establish that these functions are auxiliary, nor did the testimony establish that these are normal properties of refractory brick. Furthermore, the record is not entirely clear as to whether the merchandise is ceramic, as is necessary for plaintiff's claimed classification.[11] Inasmuch as this was not the focus of the evidence presented at trial, this matter is remanded to the Customs Service for consideration of this point and for classification consistent with this opinion.

---

[10] As indicated, testimony established that the side block's cathodic use is purely incidental as is the temporary aluminum making cathodic use of the bottom block during start-up.
[11] The alternative classification sought by defendant, item 535.14, TSUS, other ceramic electrical ware, is not applicable. The blocks at issue are not *ejusdem generis* with the other objects mentioned therein.