**JOHN C. ROGERS & CO., INC., a/c**
**Hoeganaes Sponge Iron Corp.**

**v.**

**UNITED STATES.**

**C.D. 4562; Court Nos. 64/20746, etc.**

United States Customs Court.

Oct. 31, 1974.

Donohue & Shaw, New York City (Charles P. Deem, New York City, of counsel), for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (Martin L. Rothstein and John N. Politis, New York City, trial attorneys), for defendant.

MALETZ, Judge:

These consolidated cases involve the proper tariff classification of articles invoiced as saggers, rings, and fire bricks that were manufactured in West Germany, exported from West Germany and Sweden, and entered at the port of Philadelphia. The imported articles consist of hollow tubes, rings and disks of silicon carbide. In use, the articles are assembled into a chamber on a kiln car and filled with a mixture of iron ore, coke and limestone. The loaded car is then passed through a tunnel kiln where the iron ore is reduced into sponge iron.

The present importations are essentially the same as those involved in John C. Rogers & Co., Inc., a/c Hoeganaes Sponge Iron Corp. v. United States, 64 Cust.Ct. 12, C.D. 3952 (1970), aff'd 58 CCPA 104, C.A.D. 1012, 436 F. 2d 1034 (1971) (hereafter referred to as *"Rogers I"*), the record in which case has been incorporated here. And as in *Rogers I,* the present importations were classified by the government as articles, wholly or in chief value of earthy or mineral substances, not specially provided for, dutiable at 15% ad valorem under paragraph 214 of the Tariff Act of 1930, as modified by T.D. 51802.

Plaintiff contends—as it did in *Rogers I*—that the imported merchandise is properly classifiable as "fire brick" and thus dutiable at 5% ad valorem under paragraph 201(a) of the 1930 Act, as modified by T.D. 54108. Additionally, plaintiff interposes a new alternative claim that if the articles are not "fire brick," they are properly classifiable as manufactures in chief value of artificial abrasive (*viz.*, silicon carbide) under paragraph 1514 of the 1930 Act, as modified by T.D. 52739, and therefore dutiable at the rate of 5% ad valorem.[1]

The relevant statutory provisions are as follows:

*Classified under:*

Paragraph 214, Tariff Act of 1930, as modified:

Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not (except synthetic materials of gem stone quality, such as corundum and spinel, and articles and wares composed wholly or in chief value of such materials, and except marble chip or granito):

If not decorated in any manner:

*   *   *   *   ,   *   *

Other ............ 15% ad val.

*Claimed under:*

Paragraph 201(a), Tariff Act of 1930, as modified: Fire brick, not specially provided for . . . 5% ad val.

*Alternatively claimed under:*

Paragraph 1514, Tariff Act of 1930, as modified:

All the following, if not containing over 0.1% of vanadium, or over 0.2% of tungsten, molybdenum, boron, tantalum, columbium or niobium, or uranium, or over 0.3% of chromium:

*   *   *   *   *   *

Manufacturers of which corundum or artificial abrasive is the component material of chief value, not specially provided for (except wheels in chief value of corundum or silicon carbide) ...... 5% ad val.

I

The merchandise which, as previously noted, is essentially the same as that involved in *Rogers I* was aptly described by the appellate court in that case as follows (58 CCPA at 106, 436 F.2d at 1035):

The imports consist of molded, silicon carbide tubes and interiorly flanged rings. The tubes are about 18 inches in length and 14 inches in outside diameter with ¾ inch thick walls. The flanged rings are adapted to receive the ends of the tubes and interlock them in stacks as illustrated in plaintiff's exhibit 7, which shows

1. In its complaint, plaintiff made a further alternative claim for classification of the imported merchandise under paragraph 1558 of the 1930 Act, as modified by T.D. 52739 as manufactured articles, not specially provided for. This claim, however, has not been briefed by plaintiff and is therefore deemed abandoned.

the tubes and rings assembled into furnaces or reaction chambers to be exteriorly heated, supported on a kiln car:

When assembled as illustrated above, except for the addition of the lids, the resulting structures are charged with a mixture of iron ore, coke, and limestone, the lids are placed on their tops, and the loaded kiln car is introduced into a kiln in which the iron ore is reduced to sponge iron.

As pointed out by the trial court in *Rogers I*, the importations are used in the following manner (64 Cust.Ct. at 14):

* * * The tubes and rings are often but not always, used with a bottom plate * * * which is leveled with mortar on the platform of a kiln flat car. A tube is put on the bottom plate; a ring is put on the tube, then another tube, another ring, and so on until four tubes and four rings are pyramided on one another, into a so-called reaction chamber. Twenty such chambers are built up on a kiln flat car. The outside rings of each chamber touch on one another to provide a "good mesh of stability to the individual chambers," * * *. No mortar is used between the tubes and rings since "the material itself sweats a little and it bonds itself fairly nicely; enough for * * * [Hoeganaes] purpose." * * *

Each of the chambers is next filled or charged with raw materials consisting of a hollow iron ore cylinder, about six feet tall, embedded in a mixture of coke and limestone. After the chambers are filled, they are topped with a lid. The kiln flat cars with the chambers charged and lidded, are then moved, like railroad cars, through a kiln tunnel, * * *. The kiln tunnel is a continuous operation; as one kiln car leaves the tunnel (the number of kiln cars in the tunnel at the same time is not a matter of record, but is apparently more than one), another enters the tunnel. It takes "in the order" * * * of 35 hours to heat the chambers built on

the kiln cars and effect reduction, by coke, of the iron ore into fairly strong, but hollow porous cylinders of iron, which are pulled out of the various chambers by specially designed tongs. The residue coke and limestone is then vacuumed out of the chambers. The chambers, unless there is damage requiring repair, are again recharged and put through the tunnel cycle.

Against this background, the trial court in *Rogers I* determined that the provision for "fire brick" was a use provision and concluded, on the basis of lexicographic authorities and administrative publications, that the common meaning of the term "fire brick" in 1930 covered only a refractory (i. e., a nonmetallic heat-resistant article) used in the construction of linings for furnaces, ovens and similar installations and that, contrary to plaintiff's contention, did not include all refractory shapes "used for the purpose of resisting intense heat" such as "saggers and kiln furniture." 64 Cust.Ct. at 18. The trial court further concluded (*id.* at 19) that the importations did not "fairly and clearly" meet the essential criteria for "fire brick" on the following stated basis (*ibid.*):

> These imported tubes and rings, in the condition as imported, meet rather exacting specifications. * * * All that needs be done is to assemble the tubes and rings into a chamber which may, or may not be, akin to a furnace, oven, or exotic sagger. Assembling the tubes and rings into a chamber is not "fairly and clearly" like constructing a furnace or oven. Fire brick used in the construction of a furnace or oven also connotes a masonry unit of a sort. These tubes

and rings are not used as masonry units. They are prefabricated units designed to fit together in an orderly manner and more than mere fire brick which along with some special, but still standard shapes, are used as linings for furnaces and ovens. * * * There is no need to further expound on the distinctions. They are carefully lexiconed. Nowhere have we found that the word "assemble" is synonymous with the word "construction" or "construct." We are satisfied that these distinctions are valid, and that they are fatal to the classification of these imported tubes and rings as "fire brick".

In affirming, the appellate court held that "the lower court's determination that the common meaning of the term 'fire brick,' as of the effective date of the Tariff Act of 1930, did not cover custom-designed, major components of prefabricated structures, such as the importations at bar, is not clearly contrary to the weight of the evidence." 58 CCPA at 108, 436 F.2d at 1038. The appellate tribunal further pointed out that the trial court had concluded that the importations did not come within the common meaning of the term "fire brick" "because they are 'prefabricated units' designed to be *assembled* into the furnaces and not 'masonry units' designed to be used in *constructing* them." 58 CCPA at 110, 436 F.2d at 1039. [Emphasis in original.] On this aspect, the appeals court stated that "[w]e cannot say that * * * [the trial court's] conclusion that this distinction is in accord with the common meaning of the term 'fire brick' as of the effective date of the statute here involved is clearly contrary to the weight of the evidence." *Ibid.*[2]

---

2. The trial court also noted that "it is the concensus of the reference authorities, *supra*, that 'fire brick' comes in a variety of sizes and shapes. We have therefore, eliminated size and shape as essential criteria for 'fire brick'. For the same reason we rule out limiting the term 'fire brick' to the generally accepted connotation of rectangular shaped brick, or shapes with one 'classically rectangular side' which is what defendant argues for." 64 Cust.Ct. at 18. As to this, the appeals court found that it was "unnecessary to comment on the Government's contention, rejected below, that, as of the effective date of the Tariff Act of 1930, the term 'fire brick' was commonly applied only to articles which were small and which had at least one planar, rectangular face." 58 CCPA at 108, 436 F.2d at 1038.

## II

In the present case, plaintiff called, in addition to the president of Hoeganaes, two expert witnesses to support its contention that all refractory shapes used for the purpose of resisting intense heat were, in 1930, commonly included in the term "fire brick." The first of these witnesses was Harold A. Heiligman, a self-employed refractory consultant, who had also testified for plaintiff in *Rogers I.* At the present trial, he testified that in 1930 the term "fire brick" meant a refractory which was formed into a specified shape and then fired; that fire brick was made in a great variety of shapes including special shapes made to form rings and muffles; that in 1930, in characterizing articles as fire brick, no distinction was made between articles that were used as masonry articles and custom-designed articles that were assembled into refractory structures; that the term "fire brick" included custom-designed major components of prefabricated structures; and that fire bricks were not always mortared together (e. g., the bottoms in open hearth furnaces were put in dry, as were many refractory roofs).

Mr. Heiligman further testified that the importations in issue are not describable as kiln furniture [3] but rather are fire brick; and that the fact that the importations (i) are in the shape of tubes and rings, (ii) are custom-designed and prefabricated, (iii) are stacked on top of each other, and (iv) are not mortared together, does not affect their classification as fire brick.

Additionally, the witness testified that the tubular articles before the court could be termed saggers as that word was known in 1930; that some people called the articles saggers, while others did not since it was a matter of definition; and that he personally would not call them saggers or retorts. He stated that the purpose of the imported articles was to form reaction chambers to contain the material being fired and to protect it from kiln gas during the reduction process.

Finally, Mr. Heiligman testified that his definition of fire brick included crucibles,[4] retorts [5] and kiln furniture.

Plaintiff's second expert witness was Professor Frederick H. Norton, a consultant in the general field of ceramics. His career began in 1923 when he was employed by the Babcock & Wilcox Company (one of the largest refractory manufacturers in the country) to develop new products and help in the methods of manufacture. After eight years with Babcock & Wilcox, he was appointed to the faculty of the Massachusetts Institute of Technology as head of the Division of Ceramics, a position he held until his retirement in 1961. He has received numerous honors and awards in the ceramics field and has published four books and over 100 articles in that field. One of his published books is *Refractories* which is generally considered to be the authoritative work on that subject.

Relating his testimony to the period around 1930, he stated that a refractory was a nonmetallic material capable of withstanding high temperatures, and that refractories can be divided into two general groups as follows: (1) fire brick which is formed to a specific size and shape in the plant and fired to stabilize that shape and size and then shipped to the customer to be used; and (2) granular refractories such as castables, plastic refractories, motars, etc., which are shipped in bulk. He then defined the term "fire brick" as a refractory article which

---

3. Kiln funiture is defined as supports and containers for ceramic ware while it is being fired. See Norton, *Refractories* (3d ed., 1949) p. 527.

4. The witness defined the term "crucible" as used in the refractories industry as a cylindrical shaped vessel, wider at the top than at the bottom, which will normally hold liquid metals of some kind.

5. In the refractory industry, a retort, according to the witness, is a refractory vessel in which a metallurgic reaction takes place and the products of the reaction gases are conducted away.

is formed to a specific size and shape and then fired to stabilize it. In other words, in his opinion all shaped refractories are commonly referred to as "fire brick." He believed that the majority of persons in the industry used that definition, but agreed that a minority took a narrower view. In this connection, he said that there were a few people in the industry who defined fire brick as small fired refractories which had at least one rectangular side of specified dimensions and included arches and wedges which had such dimensions. However, he indicated that this was a very narrow definition and that the general opinion in the industry was that "fire brick" was defined in much broader terms, in accordance with his own previously stated definition.

The witness stated that the terms "refractory brick" and "fire brick" are often used as synonymous terms and that the word "brick" was an abbreviated term to describe both types of brick. Continuing, he testified that in 1930, fire brick was made in a great variety of sizes; that some—such as glass tank refractories—weighed as much as a ton; and that fire brick was made in a great variety of shapes, including tubes and rings.

The witness did not agree. that fire brick is always used to construct or line furnaces or kilns; instead, he stated, it is used for other purposes such as in kiln furniture, as piles for supporting a floor, etc. He added that mortar is not always employed in the use of fire brick; that in order to be fire brick, the refractory did not have to be a masonry unit; and that in 1930, custom-designed articles which were major components of refractory structures were describable as fire brick.

Professor Norton further testified that he would consider the silicon carbide refractories before the court to be "fire brick" and that they would have been so considered as that term was understood in the refractory industry in 1930. In his opinion, the fact that the imported articles were custom-designed

and assembled into reaction chambers by being stacked on top of each other without the use of mortar does not affect their classification as fire brick. In short (as previously indicated) he believed that all refractory shaped articles were commonly referred to as fire brick. Thus he testified that kiln furniture was describable as fire brick; that a retort—which he defined as a refractory vessel or container inside of which some reaction is taking place—was commonly referred to as a fire brick. Similarly, he stated that a crucible—which he defined as a refractory container used to contain a liquid such as metal or glass—was commonly referred to as a fire brick. He added that a crucible was also commonly referred to as a crucible, and that the terms "fire brick" and "crucible" are virtually interchangeable, but that when crucibles are shown in a catalogue, they usually appear under the heading "fire brick."

On cross-examination, however, Professor Norton conceded that although his book *Refractories* (3d ed., 1949) contained (at p. 527) a discussion of kiln furniture—which (as mentioned previously) was described by Professor Norton as fire brick—nowhere in that discussion did he use the term "fire brick" or "brick" to describe that class of merchandise. Beyond that, notwithstanding that Professor Norton had testified that a retort was commonly referred to as "fire brick," that section of his book discussing retorts (pp. 531–2) made no reference to them as either "fire brick" or "brick." To like effect, although Professor Norton testified that a crucible was commonly referred to as a "fire brick," his book's discussion of crucibles (pp. 532–4) again made no reference to them as "fire brick" or "brick."

By contrast, his book in discussing so-called standard shapes and special shapes, such as cupola blocks, rotary-kiln blocks, circle brick, and rectangular tile of fireclay (pp. 523–7), refers to them as refractory brick, fire brick or brick.

Questioned as to why his book referred only to the latter types of articles as

refractory brick or brick and did not refer to articles such as kiln furniture, retorts and crucibles as fire brick or brick, Professor Norton responded as follows (R. 225):

> Well, I think it is understood by anybody in the industry. That is just an abbreviation of "fire brick" and the word is left off. It is an adjective and it isn't always put in place. I think it is understood by anybody in the industry that this is made of a type of fire brick, but it has a specific name.

Further on this aspect, when it was brought out that his book referred to kiln furniture merely as "kiln furniture," Professor Norton responded: "Well, *the whole book is about fire brick* and you have to assume that fire brick has specific names." (R. 219) [Emphasis added.] [6]

On additional cross-examination, Professor Norton testified that he recognized A. B. Searle as an authority on refractories and agreed that in the first (i. e., 1931) edition of his own book he had referred to Searle's book, *Refractory Materials: Their Manufacture and Uses* (1924), as "probably the most complete book on refractories * * *." (R. 235) The witness' attention was then directed to the following statement at p. 288 of the Searle book:

> The *shape* of fireclay bricks must be as accurate as possible. They usually measure 9 inches by $4\frac{1}{2}$ inches by 3 inches or $2\frac{1}{2}$ inches, with a small allowance for the mortar, in order that two-header bricks may lie exactly on a stretcher when the wall is built.

> The variations from the average or specified measurements should not exceed 2 per cent.; some specifications are even more stringent than this. The reason is that irregularly shaped bricks require more mortar and cannot be laid with thin joints; and as firebricks nearly always perish first at the joints, if these are irregular or if the bricks are laid carelessly, they do not form a durable structure. * * * [Emphasis in original.]

Professor Norton was then asked whether he believed that in the foregoing paragraphs Searle was using the term "fireclay brick" in the same broad, all encompassing sense in which he (Norton) had defined it, or was using the term in a narrower sense. To this Norton responded: "A broad sense. That would apply to any shape of brick." (R. 236) Professor Norton further testified that in use the imported articles might be considered to act as a retort in the reduction of sponge iron. However, he believed that the articles would be described more accurately as a reaction chamber since a retort almost always has an opening on which certain products are distilled out of the reaction, whereas such distillation does not take place in the imported articles.

Defendant called as an expert witness Maurice A. Kohler, the New York District Sales Manager of the Babcock & Wilcox Company who has had extensive experience in the refractory field beginning in 1930 when he was 15 years of age. He testified that during the period from 1930 to the present there has been no change in the manner in which the term "fire brick" has been used in the industry and that a "fire brick" is a rectangular object made of clay or other matter which is made to withstand high temperatures without deformation. With regard to size and shape, he testified that to be fire brick, two of the three dimensions must have the same measurements as a standard brick size (i. e., 9 by $4\frac{1}{2}$ by $2\frac{1}{2}$ inches or $13\frac{1}{2}$ by $4\frac{1}{2}$ by $2\frac{1}{2}$ inches). Thus, arches and wedges are included so long as these dimensional requirements are met. He further testified that in order that an article constitute fire brick, it must be used to construct or line furnaces or kilns.

---

**6.** The fact, however, is that a good deal of Professor Norton's book, *Refractories*, deals with granular refractories, such as plastic refractories, mortars, etc.—which, as the witness made clear in his testimony, are not fire brick. See e. g., chapters XI through XIV.

According to the witness, the term "special shape" as used in the refractory industry refers to a shape that does not meet any of the dimensional requirements previously mentioned and is not considered to be a fire brick. Thus, articles such as kiln furniture, retorts and tubes are not fire brick.

He stated that there is a difference in moisture content between fire brick and special shapes; that they were dried out quite differently, with fire brick put through dryers, while special shapes were dried in hot furnaces; that they were burned in entirely different manners; and that the manner in which bricks and special shapes were formed also determined whether a refractory was a fire brick or not. In this latter connection, he said, in 1930 shaped pieces such as cylinders were hand molded, whereas fire brick was for the most part either hand pressed, pressed out on a machine press or wire-cut. He also stated that there was a difference in pricing as between fire brick and other shapes. For example, the normal 9 and 13½ inch series brick were always sold at a price per thousand, while anything over that size was sold by the piece.

In Mr. Kohler's opinion, the imported articles in question were not describable in 1930 as fire brick because they did not conform to the 9 or 13½ inch dimensional requirements and failed to meet any of the other requirements. He added that in his 35 years' experience in selling refractories in the United States, Canada and Puerto Rico, he has never seen articles such as those here in issue bought, sold or referred to as fire brick.

On cross-examination of Mr. Kohler, it was developed that a catalogue of his employer, Babcock & Wilcox, issued some years ago, contained the following statements, among others:

> Other services where Allmul Firebrick have established a record of long, economical service include, malleable iron air furnaces, hot metal mixers, non-ferrous melting furnaces, butt-weld pipe furnaces, burner blocks for all sorts of furnaces, kiln furniture and piers in ceramic and enameling furnaces, glass tanks, tunnel kilns and high temperature ceramic kilns.

> \* \* \* \* \* \*

> Because of their high hot-load strength and their other refractory qualities, B&W Allmul, 80, and Junior Firebrick are used to form car tops and kiln furniture for many types of ceramic furnaces. Other uses of B&W Firebrick in the ceramics industry include linings for rotary kilns, and high temperature tunnel and periodic kilns.

> \* \* \* \* \* \*

> Installations of B&W Firebrick will be found in almost every industry which utilizes heat in its manufacturing processes. B&W Allmul, 80, and Junior Firebrick are used for complete linings, partial linings in heavy duty areas, piers, checkers, burner blocks and special applications in a wide variety of industrial furnaces and other heat enclosures.

> \* \* \* \* \* \*

> Special Shapes of B&W Allmul, 80, and Junior Firebrick are fabricated to close tolerances for easy installation in the field.[7]

Mr. Kohler testified that he disagreed with the foregoing statements in the catalogue to the extent that they referred to all the foregoing articles as fire brick. He said that the statements were prepared by the advertising department and that quite often its advertising statements were in error and had to be corrected. He recalled that at one time he called one of these errors to the attention of the advertising department and that the advertising department indicated it would correct it. Instead, he testified that the entire catalogue was eliminated some five or six years ago and that the personnel responsible for it were dismissed. Presently, he said, the cata-

---

7. Professor Norton testified that the information contained in this catalogue accorded generally with his understanding of the refractory industry's practice in 1930.

logue is in the process of revision, but had not as yet been reissued.

### III

From the foregoing, it is evident that as in *Rogers I* the testimony of plaintiff's expert witnesses at the present trial was in direct conflict with that of defendant's expert witness. Thus, similar to the situation in *Rogers I,* plaintiff's expert witnesses expressed the opinion that in 1930 *all* heat-resistant refractory shapes, which would include kiln furniture, retorts and crucibles, were commonly referred to as "fire brick." Defendant's witness, on the other hand, indicated that the term "fire brick" applied only to those heat-resistant refractory shapes which had at least one rectangular face of specified dimensions and had to be used to construct or line furnaces or kilns.

It is to be added that at the present trial the testimony of the expert witnesses for both sides was somewhat impaired on cross-examination. For example, while Professor Norton (as well as Mr. Heiligman) testified on direct examination that refractory shapes such as kiln furniture, retorts and crucibles were commonly referred to as "fire brick," it was developed on cross-examination of Professor Norton that his book *Refractories*—which, as previously indicated, is an authoritative work—did not so refer to them. And while defendant's expert witness Kohler testified on direct examination that the term "fire brick" was limited to refractory shapes which had at least one rectangular face and was used only to construct or line furnaces or kilns, cross-examination brought out the fact that a catalogue of his company, Babcock & Wilcox, used the terms "Allmal Firebrick," "Junior Firebrick" and "B&W Firebrick" in a much broader sense.

The short of the matter is that the testimony of the expert witnesses as to the common meaning of the term "fire brick" is inconclusive. Nor do I find helpful their conflicting testimony as to whether or not various articles are called "fire brick." For, as the trial court made clear in *Rogers I,* the provision for "fire brick" is a use provision and hence "it is not how an article is called but how it is used that determines whether it is [fire] brick * * *." 64 Cust.Ct. at 18.

█ In view of these considerations, particular reliance must necessarily be placed on the lexicons. And on this phase, I am in accord with the conclusion of the trial court in *Rogers I,* based on lexicons and administrative publications, that "the essential criteria of a 'fire brick' are that it is a heat resistant article used in the construction of linings for furnaces, ovens, and similar installations." 64 Cust.Ct. at 16. Among the authorities cited in *Rogers I* which I believe are persuasive in reaching this conclusion are New Century Dictionary and Cyclopedia, 1913 edition; Glossary of Mining and Mineral Industry, U. S. Department of Interior, Bureau of Mines, Bulletin 95, 1920; Webster's New International Dictionary, 1927 edition; Materials Handbook, George S. Brady, second edition, 1931; Encyclopaedia Britannica (1947), volume 9, p. 266. 64 Cust.Ct. at 16–17. Beyond that, there are other lexicons, in addition to those cited in *Rogers I,* which similarly define "fire brick" as an article used for lining furnaces. Such lexicons include Funk & Wagnalls New College Standard Dictionary, 1947; The Winston Dictionary, Encyclopedic Edition, 1957; and Britannica World Language Edition of Funk & Wagnalls Standard Dictionary, 1963.[8]

Not without significance too is the recent decision in Pittsburgh Plate Glass Company v. United States, 73 Cust.Ct. ——, C.D. 4553 (1974). In that case, so-called "tank blocks" of various sizes and shapes, mostly rectangular (1 by 2 by 3 feet) weighing between 800 and 900 pounds, which were used in constructing the lining in the lower portion of a floatglass furnace, were held to be "refractory

8. Although these lexicons were published after 1930, they are relevant since it is undisputed that the common meaning of the term "fire brick" has not changed appreciably over the years. See *Rogers I,* 58 CCPA at 109, note 5, 436 F.2d 1034.

bricks"[9] and thus within the purview of item 531.27 of the tariff schedules. In reaching this conclusion, the court (per Newman, J.) relied on *Rogers I* to find that "refractory bricks" (fire brick) are heat-resistant articles used in the construction of linings for furnaces, ovens and similar installations. The court further found that since, under the holding in *Rogers I,* size and shape are not essential criteria for fire brick, and since a float-glass furnace is a similar installation to an oven or furnace, the "tank blocks" in issue came within the common meaning of the term "refractory bricks" (fire brick). Finally, the court pointed out (73 Cust.Ct. at , slip op. at 11–12) that the fact that the imports were generally bought, sold and known in the trade as "blocks" rather than as "bricks" did not preclude their classification as "refractory bricks"—this on the basis stated in *Rogers I* (64 Cust.Ct. at 18) that "it is not how an article is called but how it is used that determines whether it is [fire] brick * * *."

In sum, it is concluded that since the importations in question are not articles used in the construction of linings for furnaces, ovens, or similar installations, they are not classifiable as "fire brick" under paragraph 201(a) of the Tariff Act of 1930, as modified. Therefore, plaintiff's claim under this provision must be rejected.

### IV

We turn next to plaintiff's alternative claim that the importations are classifiable under paragraph 1514 of the Tariff Act of 1930, as modified, as manufactures in chief value of artificial abrasive (*viz.,* silicon carbide). With respect to this claim, the parties agree that the importations are in chief value of silicon carbide and that silicon carbide was one of the artificial abrasives contemplated by paragraph 1514 of the Tariff Act of 1930. On the basis of these considerations, plaintiff insists that the importations are covered by paragraph 1514

since that paragraph, according to plaintiff, is unconditional on its face and therefore covers any manufactured article, whatever its nature or use, which is composed in chief value of an artificial abrasive.

There is a basic difficulty with this argument, however. The difficulty is that paragraph 1514 is a use provision and in order to be classified thereunder, the silicon carbide must be chiefly used as an abrasive. And the fact is that the silicon carbide here involved is not used as an abrasive; to the contrary, it is chiefly used as a refractory item. See e. g., United States v. C. J. Tower & Sons, 35 CCPA 19, C.A.D. 365 (1947); United States v. C. J. Tower & Sons, 35 CCPA 22, C.A.D. 366 (1947).

The rule that a substance may be classified as an abrasive only when it is chiefly used as an abrasive was well stated in Chrystal v. United States, 5 Ct. Cust.Appls. 489, T.D. 35148 (1915). In that case, the court held that powdered glass used on the heads of matches or sides of matchboxes was not classifiable under paragraph 432 of the Tariff Act of 1909 (the predecessor paragraph to paragraph 1514)[10] for the following reasons (*id.* at 490–1):

> The rule is well settled, we take it, that when articles are provided for under a tariff designation descriptive of their use, the operation of such a provision, when brought in competition with some other provision adequately describing the goods, is limited to things which are chiefly used for the purpose mentioned. * * *
>
> Powdered glass, therefore, can not be classified under paragraph 432 unless it be chiefly used as an abrasive, and whether it is so used depends on whether it acts as an abradant and serves a real abrasive purpose when employed as a friction agency on match heads and match boxes.
>
> In our opinion, an abrasive is a substance designed and fitted to be used

---

9. It was undisputed that the terms "fire brick" and "refractory brick" are synonymous. *Id.* at ——, slip op. at 6, note 2.

10. Paragraph 432 covered, among other things, "Crude artificial abrasives."

for the rubbing, grinding, or wearing away of particles from the surfaces of wood, metal, stone, and other hard materials, in order to produce smoothness, a polish, an edge, or other desired modifications of the surface, or a reduction in the dimensions of the thing subjected to the action of the abradant. The true, final, and distinctive purpose of an abrasive is not to produce friction or heat but to create new surfaces by rubbing or grinding away older ones. * * *

From what has been said, it is apparent that plaintiff's alternative claim for classification of the importations under paragraph 1514 is without merit.

### V

In summary, the court overrules plaintiff's claims for classification of the imported articles (1) as "fire brick" under paragraph 201(a) of the Tariff Act of 1930, as modified; and (2) alternatively, as manufactures in chief value of artificial abrasive under paragraph 1514 of the Tariff Act of 1930, as modified. Judgment will be entered accordingly.